In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00076-CR


______________________________




CANDICE PUMPHREY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the County Court at Law


Hunt County, Texas


Trial Court No. CR0600438




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



 O P I N I O N



 Lance Sharp, a police officer with Texas A & M University at Commerce, grasped the right
wrist of Candice Pumphrey to arrest her for disorderly conduct just outside the entrance to a large
dance being held on campus. (1) In response, Pumphrey "immediately started pulling away and
jerking." As Sharp kept his grasp on her wrist and attempted to move behind her to get her arms
behind her, she "refused" his efforts, "actually turning in circles" to keep Sharp from securing her
arms behind her back. Sharp also described Pumphrey's actions as "twisting and squirming, doing
everything she can to keep me from getting her hand behind her back to put her in handcuffs." Sharp
added that, when "they start twisting like that, you're going to get to the point where officer safety
is a problem. Normally in that type of situation we actually take the suspect to the ground" (2) to get
control over them. 

 Pumphrey argues on appeal (3) only that the evidence is factually and legally insufficient to
support her conviction. We affirm her conviction.

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the fact-finder's verdict is clearly wrong or manifestly
unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim.
App. 2006); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In a factual sufficiency
review, we are to afford "due deference" to a fact-finder's determinations. Marshall, 210 S.W.3d at
625. Although an appellate court reviewing factual sufficiency has the ability to second-guess the
fact-finder to a limited degree, the review should still be deferential, with a high level of skepticism
about the fact-finder's verdict required before a reversal can occur. Roberts, 220 S.W.3d at 521.

 The evidence is conflicting. Officer Sharp testified that Pumphrey clearly knew he was an
officer because of their verbal interaction after the security guard had told her she could not take her
camera into the dance and because she had seen him approaching before he grabbed her wrist. He
testified that he told her she was under arrest before grabbing her wrist and that she then began
turning in circles and pulling away from him to try to keep him from pinning her arms behind her
back.

 Sergeant Jeff Hundley, the second officer to arrive, testified that he did not hear Sharp tell
Pumphrey she was under arrest, that Sharp was already attempting to cuff Pumphrey when Hundley
arrived, and that Sharp told him Pumphrey was under arrest.

 David Vasquez, the boyfriend with Pumphrey at the time, testified that the first officer
grabbed her wrist, that Pumphrey did not see Sharp or know what was going on and "kind of pulled
away," that the officer said she was resisting arrest, and that Pumphrey was screaming, but not too
loudly. 

 Segena McGuiness, a friend of Pumphrey, testified that she remembered no curse words
being directed at the officers, that Pumphrey's back was to Sharp as he approached her, that he came
up behind her without saying anything else, that he grabbed her wrist and began twisting, and that
Pumphrey did not try to get away.

 Pumphrey testified that she had cursed at her boyfriend, that, the next thing she knew, her
wrist was being twisted and she tried to pull away, that she jerked away, and that she was screaming.
She testified Sharp twisted her wrist until her hand almost touched her forearm, so she began to
scream and to attempt to jerk her arm away. She testified that, when she got around far enough to
see who it was, she asked Sharp what was going on and that he then responded by telling her that
she was under arrest for resisting arrest. She testified that, after the first hard jerk, she was "jerking,
but it wasn't like I was really pulling. The first initial jerk, I jerked." She also pointed out that she
made no effort to run away, push the officer, or leave the scene. 

 Pumphrey also testified that, when Sharp "slammed" her onto the hood of his car, he split her
lip. She also testified that she complained about her wrist and arm being hurt during her arrest and
that, after numerous complaints, she was examined by a paramedic and taken to a hospital. The
medical conclusion was that her arm was sufficiently twisted to cause a severe sprain, for which she
was given a splint for her wrist. 

 Pumphrey argues evidentiary insufficiency as to two elements of the State's case. First, she
argues that the evidence does not establish that she knew an officer was attempting to arrest her, only
that she turned and pulled to determine the identity of the person grasping her wrist. Second, she
claims the evidence shows that her actions were merely noncooperation and did not rise to the level
of resisting arrest.

 As to Pumphrey's argument that she did not know an officer was attempting an arrest, the
proof conflicts. The officers provided testimony that showed Pumphrey knew an officer was
involved. Pumphrey and two of her witnesses testified she was not looking at the officer and thus
did not know who had grabbed her. The testimony could have been understood either to show she
was watching the officer and was aware of his approach or that she had talked to him and then turned
her back on him and thus did not know he was approaching to grab her. The evidence supporting
the verdict is neither so weak nor so outweighed by the great weight and preponderance of the
evidence as to make the verdict clearly wrong or manifestly unjust. See id. at 524. After affording
due deference to the fact-finder's determination, we conclude legally and factually sufficient evidence
supports this aspect of the verdict. See Marshall, 210 S.W.3d at 625.

 The essence of Pumphrey's second argument is that one cannot commit the offense of
resisting arrest in Texas by just pulling against an officer's effort to physically control him or her,
but only by directing force toward the officer. Though this argument finds some support from some
cases, we hold that the statute authorizes a conviction for resisting arrest when the defendant actively
pulls against (4) an officer's established grasp of the defendant during an arrest attempt. We also
conclude the statute is satisfied by evidence of jerking against, turning in circles to resist, twisting
and squirming to thwart, and struggling against, an officer's efforts to arrest an individual. For that
reason, we affirm Pumphrey's conviction.

 Section 38.03 of the Texas Penal Code frames the offense of resisting arrest--as is relevant
to the current case--with a requirement that the subject use "force against" a known peace officer
and thereby obstruct the officer from effecting an arrest. See Tex. Penal Code Ann. § 38.03(a)
(Vernon 2003). Therefore, if the record supports a finding that Pumphrey used "force against" the
officer, we must affirm her conviction for resisting arrest.

 The record reflects that Pumphrey "pulled" and "jerked" against the officer's restraining
efforts applied to her wrist and, while doing so, squirmed and twisted and turned her body in relation
to the officer to keep the officer from getting both of her arms pulled behind her. Based on the
record, the fact-finder could have concluded Pumphrey and the officer struggled for at least a few
seconds such that the officer was, for that period of time, unable to get her under control and was
considering whether he would have to physically take her to the ground to achieve the control he
deemed necessary to effect the arrest. Beyond that, we find no evidence in the record that Pumphrey
specifically directed any aggressive force toward the officer or struck him in any way.

 Texas cases differ on what is required to establish a use of "force against" an officer under
Section 38.03 of the Texas Penal Code. See Thompson v. State, 987 S.W.2d 64, 64-65 (Tex. Crim.
App. 1999) (Keller, J., dissenting on denial of pet.); Gary v. State, 195 S.W.3d 339, 341 (Tex.
App.--Waco 2006, no pet.); Haliburton v. State, 80 S.W.3d 309, 312 (Tex. App.--Fort Worth 2002,
no pet.). The statute is silent on that question, requiring only that the actor use "force against" the
officer. See Sheehan, 201 S.W.3d at 823; Anderson v. State, 707 S.W.2d 267, 270 (Tex.
App.--Houston [1st Dist.] 1986, no pet.). Many cases have at least verbalized a distinction between
a force directed toward an officer and a force that opposes the officer's effort to arrest but which is
directed away from him or her. See, e.g., Humphreys v. State, 565 S.W.2d 59, 60 (Tex. Crim. App.
1978) (striking officer's arms away, pushing at officer, and struggling with officer is sufficient);
Sartain v. State, 228 S.W.3d 416, 425 (Tex. App.--Fort Worth 2007, pet. ref'd) (flailing arms,
striking officer, pushing against officer, struggling causing fall; sufficient); Gary, 195 S.W.3d at 341
(releasing  attack  dog  on  officer;  sufficient);  Torres  v.  State,  103  S.W.3d  623,  627  (Tex.
App.--San Antonio 2003, no pet.); Bryant v. State, 923 S.W.2d 199, 208 (Tex. App.--Waco 1996,
pet. ref'd); Mayfield v. State,758 S.W.2d 371, 374 (Tex. App.--Amarillo 1988, no pet.) (attempts
by subject to "shoulder" or "elbow" officer out of car, jerking against officer's grasp, and engaging
in "pretty violent" struggle; sufficient); Raymond v. State, 640 S.W.2d 678 (Tex. App.--El Paso
1982, pet. ref'd) (simple pulling away; insufficient). (5)

 Some cases explicitly hold that only a force directed toward an officer can support a
conviction. See Leos, 880 S.W.2d 180; (6) Raymond, 640 S.W.2d at 679. But most cases involve
actions that are clearly more than a simple pulling away from the officer's restraint. See, e.g.,
Haliburton v. State, 80 S.W.3d 309, 312-13 (Tex. App.--Fort Worth 2002, no pet.) (kicking at
officer but missing; sufficient); Luxton v. State, 941 S.W.2d 339, 340-41 (Tex. App.--Fort Worth
1997, no pet.) (pulling away, plus struggling or fighting with officers; sufficient); Mayfield, 758
S.W.2d at 373 (using elbows and shoulder to shove arresting officer out of moving car; sufficient);
Burke v. State, 692 S.W.2d 570, 571 (Tex. App.--Houston [14th Dist.] 1985, no pet.) (striking
officer's arm away; sufficient); see also Westbrook v. State, No. 14-06-00040-CR, 2007 Tex. App.
LEXIS 909, at *15-16 (Tex. App.--Houston [14th Dist.] Feb. 8, 2007, no pet.) (mem. op., not
designated for publication) (suggesting that twisting and pulling away is sufficient).

 Anderson is sometimes cited (7) for the proposition that merely shaking off an officer's grasp
is insufficient. 707 S.W.2d at 269-70. We note, however, that in Anderson the parties agreed to that
proposition. Id. Therefore, though the appellate court cited Raymond for that proposition, it had not
been called on to rule on that issue. Additionally, there was evidence that Anderson struck the
officer. The court affirmed Anderson's conviction.

 Young v. State is sometimes cited for the proposition that merely pulling away from an officer
does not constitute resisting arrest. 622 S.W.2d 99, 100-01 (Tex. Crim. App. 1981). True, Young
pulled away from an officer, but he pulled away only after his arrest had already been completed. 
Thus, it was his pulling away after having been arrested that was addressed. Plus, he actually struck
the officer. We do not understand Young as authority that simple pulling away is insufficient.

 We agree with the cases which criticize the above distinctions. See Torres v. State, 103
S.W.3d 623, 627 (Tex. App.--San Antonio 2003, no pet.); Hopper v. State, 86 S.W.3d 676, 679
(Tex. App.--El Paso 2002, no pet.); Bryant v. State, 923 S.W.2d 199, 207 (Tex. App.--Waco 1996),
pet. ref'd, 940 S.W.2d 663 (Tex. Crim. App. 1997). We agree that Section 38.03 of the Texas Penal
Code does not require action directed at or toward an officer, just force exerted in opposition to his
or her efforts at making an arrest.

 The distinction between force directed toward the officer and force in opposition to, but away
from, the officer can result in almost metaphysical analyses. Must the principal motion of the
defendant be toward the officer? What if he or she moves mostly away from the officer, but some
portion of his or her body moves toward the officer, as in flailing arms? What if there is a turning
or twisting so that at least part of the body moves toward the officer? Must the actions of the
defendant actually endanger the officer? How likely must that danger be? What if the "simple"
pulling away is so forceful that it causes the officer injury or causes the officer to lose his or her
balance? Is that enough? What if the pulling away can be characterized as a struggling with the
officer? Is there a distinction between a forceful or violent pulling away and a more casual pulling
away? Can one "shake off" an officer's grip without moving toward the officer? Is that force
directed toward the officer?

 All of those questions can be avoided by simple reference to the statute, which defines
"resisting" arrest by using "force against" an officer or another. The ordinary meaning of "resist"
does not require that the resistance be directed toward the person or force being resisted. To "resist"
is to "exert oneself so as to counteract or defeat." Merriam-Webster's Collegiate Dictionary
1060 (11th ed. 2006). Interpreting "force against" to require that force be directed toward the officer
contradicts the ordinary meaning of the word "resist." In the absence of a statutory definition to the
contrary, we believe the proper understanding of "against" in the context of "resisting arrest" allows
for the use of force in opposition to, but not necessarily directed toward, the officer who is
attempting to make an arrest. We conclude that "against," as used by Section 38.03 of the Texas
Penal Code, does not require force directed at or toward the officer, but also is met with any force
exerted in opposition to, but away from, the officer, such as a simple pulling away.

 In 1975, the Texas Court of Criminal Appeals ruled that a quite forceful pulling was enough
to constitute resisting arrest, where the defendant was very large and pulled hard enough to drag two
officers to her front door. See Washington v. State, 525 S.W.2d 189, 190 (Tex. Crim. App. 1975). 
We see little logical difference between Washington and the case at hand, unless the relative amount
of force exerted by the accused, the relative strength of the accused and the arresting officer, (8) or the
relative danger to an officer is an important factor. None of those factors appear to us to be
contained within Section 38.03 of the Texas Penal Code.

 Here, Pumphrey forcefully pulled away from the officer's restraining grasp. Therefore, her
conviction must stand. That being said, we add that, here, Pumphrey did more than merely pull away
from the officer. She jerked, she squirmed, she twisted, she turned, and she struggled, all against the
officer's efforts to physically restrain her in the process of making the arrest. Those actions also
sufficiently support the conviction.

 Because legally and factually sufficient evidence supports Pumphrey's conviction, we affirm
the judgment of the trial court.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: December 27, 2007

Date Decided: January , 2008


Publish
1. The whole confrontation started when Pumphrey, while waiting to enter the dance, uttered
some obscenities when told by a security guard that she could not take a camera in. Those
obscenities were directed at her boyfriend because it was cold outside, and the boyfriend refused her
request that he take the camera back to the car for her. Officer Sharp, who observed this, testified
that he told Pumphrey to watch her language and that she looked at him and said, "F*** you." Sharp
testified that he then approached her and asked her if there was a problem, to which she replied, "I'm
not f****ng talking to you." Predictably, Sharp took this poorly, told her she was under arrest,
grasped her by the wrist, and attempted to take her into custody for disorderly conduct.
2. Sharp elected not to take Pumphrey to the ground for three stated reasons: (1) they were
standing on a concrete floor, (2) Pumphrey was wearing a short skirt, and (3) going to the ground
with Pumphrey would have posed a possible officer safety issue since at the time they were
surrounded by a crowd of other young people waiting to get into the dance. 
3. Pumphrey was convicted by the trial court of misdemeanor resisting arrest. The court
assessed punishment at thirty days' incarceration, probated for twelve months, a fine of $250.00, and
court costs of $264.00.
4. We need not address mere passive resistance, or simple noncooperation, where one sits with
arms crossed, crawls away, or the like. See, e.g., Sheehan v. State, 201 S.W.3d 820, 823 (Tex.
App.--Waco 2006, no pet.); Leos v. State, 880 S.W.2d 180 (Tex. App.--Corpus Christi 1994, no
pet.) (involving more than simple noncooperation). Here, we are faced with active opposition to the
officer's efforts to arrest.
5. Some cases consider whether the officer is endangered in any way as a factor supporting
such a conviction. See Sheehan, 201 S.W.3d at 823; Gary, 195 S.W.3d at 341; Raymond, 640
S.W.2d at 679; Bryant, 923 S.W.2d at 206. But we find in Section 38.03 of the Texas Penal Code
no requirement of officer danger.
6. Leos actually involved more than a simple fleeing. There was a struggle on the ground
between Leos and multiple officers which lasted for one or two minutes. The court characterized
Leos' actions as all being directed away from the officers. See Leos, 880 S.W.2d at 184.
7. See Sheehan, 201 S.W.3d at 823; Campbell v. State, 128 S.W.3d 662, 671 (Tex.
App.--Waco 2003, no pet.).
8. Sharp stands six feet, two inches tall. A second officer, who was six feet, seven inches and
weighed 265 pounds, joined Sharp, and the two managed to pin Pumphrey's arms and handcuff her. 
Pumphrey is five feet, four inches tall, and weighed 130 pounds at the time. There is no indication 
she had any particular level of martial arts expertise.



n arbitrary manner, without reference
to guiding rules or principles. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991). 
Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable
judgment even if it would have reached a contrary conclusion. Walker v. Packer, 827 S.W.2d 833,
839-40 (Tex. 1992). The trial court does not abuse its discretion if some evidence reasonably
supports the trial court's decision. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).

 Solomon claims the trial court erroneously granted Steitler's challenge for cause of
venireperson Evelyn Riepe because the court misinterpreted Riepe's answer to a question posed by
counsel for Steitler. The relevant exchange is brief:

 [STEITLER'S COUNSEL]: You're the only person that can answer there,
Ms. Riepe. Based upon your personal contact with the Russells, the fact that you
have sold them a house, that you've maintained a friendship with them over a number
of years, can you tell me that wouldn't affect your judgment in this case at all?

 

 MS. RIEPE: It might.

 THE COURT: Okay. I have to make the ultimate decision on these, and I
need either a yes or a no. Possibly, maybe I could, maybe, okay, or whatever, I need
a yes or no.

 

 MS. RIEPE: Yes. 

 

 THE COURT: I'll take up any challenges at the end of the voir dire.

 

The trial court also addressed the issue of venireperson Riepe at the conclusion of voir dire:

 THE COURT: Does the Plaintiff Steitler have any challenges for cause? 

 [STEITLER'S COUNSEL]: We do, your Honor. We would challenge juror
number seven, Evelyn Alice Riepe. 

 

 THE COURT: And it's granted.

 . . . . 

 THE COURT: . . . Does the Plaintiff Bullard have any challenges for cause?

 [COUNSEL FOR BULLARD]: I missed his.

 [STEITLER'S COUNSEL]: Seven and 28.

 [COUNSEL FOR BULLARD]: Number six, which she admitted - - 

 [DEFENSE COUNSEL]: Related.

 [COUNSEL FOR BULLARD]: Yeah. She knew Mr. Russell, and she said
that would affect her ability to sit on this case. She knew him, and she didn't feel
like that she could hear the evidence fairly. Number six.

 

 THE COURT: Number six?

 

 [COUNSEL FOR BULLARD]: Yes, sir.

 

 THE COURT: The one I recall, her response was that she had been to a
birthday party and some of that stuff, but now Ms. Riepe was the one that actually
said she couldn't, juror number seven.

 

 [COUNSEL FOR BULLARD]: Okay. So you're saying I've got the wrong
juror.

 

 THE COURT: I've got number six is not - - 

 

 [COUNSEL FOR BULLARD]: Number six, I think. Number seven. I've
got it circled, number seven, and it says that she could not be fair.


 Solomon contends that, since Riepe answered a negative question in the affirmative, the trial
court was presumably confused by the negative question. Solomon interprets this exchange as Riepe
acknowledging that actually, "yes," her friendship with Russell would not affect her judgment. 

 Steitler contends that Solomon failed to preserve this issue for appellate review, and even if
the issue was preserved, any error was harmless. In general, voir dire objections must be timely and
plainly presented. Vasquez, 189 S.W.3d at 759; see, e.g., Hallett v. Houston Nw. Med. Ctr., 689
S.W.2d 888, 889-90 (Tex. 1985) (appellant waived trial court's error in failing to excuse juror for
cause by not informing court before exercise of peremptory challenges that counsel lacked sufficient
peremptory challenges to remove all objectionable jurors); see also Tex. R. App. P. 33.1(a)(1)
(timely objection to trial court required to preserve complaint for appeal). 

 We find only one civil case involving this precise issue. In Urista v. Bed, Bath & Beyond,
Inc., 245 S.W.3d 591 (Tex. App.--Houston [1st Dist.] 2007, no pet.), the trial court announced the
juror numbers of those who were being excused for cause. At no point in the proceedings did
Urista's attorney request that the trial court bring the contested juror forward for individual
questioning, nor was there objection to the trial court's ruling granting the challenge for cause of this
juror. The Urista court determined that, in light of the failure to object when the trial court granted
the challenge for cause, Urista waived his complaint on appeal. Id. at 596 (citing Tex. R. App. P.
33.1(a)(1)).

 To preserve error, a timely, specific objection must be made. Tex. R. App. P. 33.1(a). A
"timely" objection is one interposed at a point in the proceedings which gives the trial court the
opportunity to cure any alleged error. Beall v. Ditmore, 867 S.W.2d 791, 795 (Tex. App.--El Paso
1993, writ denied). In this case, there was an opportunity for Solomon's attorney to object, or to
have venireperson Riepe called forward for individual questioning in order to clarify the apparent
confusion. Having failed to do so, we find that Solomon waived this point of error on appeal. 

 While we believe the failure to properly preserve error on appeal is determinative on this
point, there is another reason why the point cannot be sustained. Solomon does not allege or attempt
to demonstrate how any harm resulted by reason of the adverse ruling. It has long been the
established rule in this state that, even though the challenge for cause was improperly sustained, no
reversible error is presented unless appellant can show he or she was denied a trial by a fair and
impartial jury. City of Hawkins v. E.B. Germany & Sons, 425 S.W.2d 23, 26 (Tex. App.--Tyler
1968, writ ref'd n.r.e.); see Gray v. State, 233 S.W.3d 295, 298 (Tex. Crim. App. 2007). The record
before us fails to show that Solomon's attorney objected to any juror on the panel. It must, therefore,
be presumed that Solomon was afforded a fair and impartial jury, and no harm could have resulted
by reason of the court's dismissal of venireperson Riepe. The trial court did not abuse its discretion
in granting this challenge for cause.

(5) The Award of Appellate Attorneys' Fees Was Impliedly Conditioned on a Successful Appeal


 The jury assessed attorneys' fees for the Bullards and Steitler. These awards were
incorporated into the final judgment of the trial court. In addition to fees awarded for pretrial and
trial work, Solomon was ordered to pay $7,500.00 to Steitler and $7,500.00 to the Bullards "if
appealed to court of appeals." Because these fees were conditioned only on an appeal being filed,
and not expressly on Steitler and the Bullards' successful appeals, Solomon contends the attorney
fee awards are void.

 The trial court may not grant an award of appellate attorney's fees unless such award is
conditioned on a successful appeal, as doing so could penalize a party for pursuing a meritorious
appeal. Tex. Farmers Ins. Co. v. Cameron, 24 S.W.3d 386, 400 (Tex. App.--Dallas 2000, pet.
denied). The Bullards and Steitler agree with this proposition, but claim the judgment of the trial
court implicitly conditions the award of appellate attorney's fees on a successful appeal. Spiller v.
Spiller, 901 S.W.2d 553, 560 (Tex. App.--San Antonio 1995, no writ); see also Dorman v. Arnold,
932 S.W.2d 225, 229 (Tex. App.--Texarkana 1996, no writ) (where attorney's fees are contingent
on success, award should be read to implicitly require success).

 This issue was addressed in Spiller, wherein appellate attorney's fees were awarded, but were
not explicitly made contingent on success. The court, having recognized that unconditional awards
of appellate attorney's fees may not be awarded, determined that it was implicit in the court's
judgment that the award of appellate attorney's fees is conditioned on a successful appeal. 
Robinwood Bldg. & Dev. Co. v. Pettigrew, 737 S.W.2d 110, 112 (Tex. App.--Tyler 1987, no writ).

 As in Spiller, the judgment before this Court does not explicitly condition the award of
appellate attorney's fees on the Bullards' and Steitler's success on appeal. We recognize, however,
that the award implicitly requires success in order to recover the fees. Accordingly, this Court will
reform the judgment to explicitly clarify that the award is conditional. CPS Int'l, Inc. v. Harris &
Westmoreland, 784 S.W.2d 538, 544 (Tex. App.--Texarkana 1990, no writ). In CPS, this Court
held that an unconditional award of appellate attorney's fees is improper. When the trial court errs
by failing to condition the award of appellate attorney's fees, this error can be corrected by reforming
the judgment without the necessity of sending the case back to the trial court. Id.

(6) Solomon Waived His Complaint Concerning the Issuance of the Injunction

 The final judgment incorporated the jury's damage findings as well as a permanent injunction
issued by the trial court. Solomon challenges the trial court's issuance of a permanent injunction as
a violation of the one satisfaction rule, in light of damage awards for the same harm the injunction
is intended to remedy. (18) The Bullards claim this issue was not preserved for appellate review, and
was thus waived. We agree.

 To preserve a complaint for appellate review, a party must have presented to the trial court
a timely request, objection, or motion that states the specific grounds for the desired ruling, if they
are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a). "To
preserve a point of error in a judgment, a party must inform the trial court of its objection by a
motion to amend or correct the judgment, a motion for new trial, or some other similar method." 
Homes v. Humphrey, 244 S.W.3d 570, 582 (Tex. App.--Beaumont 2008, pet. denied); Dal-Chrome
Co. v. Brenntag Sw., Inc., 183 S.W.3d 133, 144 (Tex. App.--Dallas 2006, no pet.); see also Holland
v. Hayden, 901 S.W.2d 763, 765 (Tex. App.--Houston [14th Dist.] 1995, writ denied) (motion for
new trial is appropriate method for preserving error regarding alleged defect in final judgment). 

 The record before us provides only a brief glance at this issue, during the following exchange
at the charge conference:

 [DEFENSE COUNSEL]: I had mentioned the injunction provision, Judge,
and you considered that?

 

 THE COURT: There has been a submission by the Court concerning any
future damages that the Court will consider as to an injunction against the defendants
to have the water removed from their property.

 

 Mr. Russell?

 

 [COUNSEL FOR THE SOLOMONS]: I have nothing further other than
related to the charge.

 THE COURT: Okay.

 From this brief exchange, we see that no objection to the issuance of injunctive relief was
made. (19) There is no indication in the record that Solomon raised the issue of the propriety of
injunctive relief or otherwise contested the grant of injunctive relief in the trial court. Moreover, this
issue was not raised via motion to amend or correct the judgment or in a motion for new trial. 

 Solomon contends that, because the issue specifically complained of, the grant of a
permanent injunction, was tried to the trial court, Solomon was relieved of the error preservation
requirements set forth in Rule 33.1(a) of the Texas Rules of Appellate Procedure. (20) Instead,
Solomon relies on Rule 33.1(d), which provides that, in a nonjury case, a complaint regarding the
legal or factual insufficiency of the evidence--including a complaint that the damages found by the
court are excessive or inadequate--may be made for the first time on appeal in the complaining
party's brief. Tex. R. App. P. 33.1(d).

 The standard for legal sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review. Wilson, 168 S.W.3d at 827.
The evidence is legally sufficient if it "would enable reasonable and fair-minded people to differ in
their conclusions." Id. at 822. When considering a factual sufficiency challenge, the entirety of the
evidence is weighed and considered, not just that evidence which supports the verdict. Ramsay v.
Tex. Trading Co., 254 S.W.3d 620, 625 (Tex. App.--Texarkana 2008, pet. denied) (citing Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998)). The verdict will be set aside only
if the evidence is so weak or the finding is so against the great weight and preponderance of the
evidence that it is clearly wrong and unjust. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996).

 Here, the issue on appeal is not framed in terms of the sufficiency of the evidence. Said
another way, Solomon does not question the sufficiency of the evidence on which the permanent
injunction is based. Rather, the issue is framed in terms of a legal question, i.e., whether the grant
of injunctive relief in combination with monetary damages awarded violates the one satisfaction rule. 
This issue, akin to an election of remedies, was not raised in the trial court. Judgment error
regarding questions of law must be raised in the trial court. See Holland v. Wal-Mart, 1 S.W.3d 91,
94-95 (Tex. 1999) (Wal-Mart did not waive purely legal issue of whether attorney's fees were
recoverable under statute, as it specifically challenged the availability of attorney's fees before the
error resulted); Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 600 (Tex. App.--Amarillo
1995, no writ) (constitutional challenge to grant of temporary injunction not preserved when it was
merely alleged in answer that temporary injunction would violate rights under United States and
Texas Constitutions, with no specification of constitutional right infringed). Thus, to preserve a
complaint that the judgment awards a double recovery, a party must raise that complaint in the trial
court, either before judgment or in a post-judgment motion. Waite Hill Servs., Inc. v. World Class
Metal Works, Inc., 959 S.W.2d 182, 184 (Tex. 1998) (party preserved complaint for appellate review
when it properly requested, before judgment, that trial court require opponent to elect its remedy). 
Here, no such objection was raised.

 Solomon relies on Boudreaux v. Culver, No. 01-03-01247-CV, 2005 WL 1111237 (Tex.
App.--Houston [1st Dist.] May 5, 2005, no pet.) (mem. op.), in support of his position that the issue
of double recovery need not have been raised in the trial court. As in this case, Boudreaux involved
a dispute between neighbors for the alleged negligent flooding of property. The judgment included
an award of monetary damages for both temporary and permanent injuries based on the jury verdict
as well as an award of permanent injunctive relief by the trial court, requiring Boudreaux to
implement a drainage plan. 

 The sequence of events in Boudreaux was markedly different from those presented here. In
Boudreaux, a motion requesting injunctive relief was filed in the trial court, to which Boudreaux
filed a motion in opposition. (21) Thereafter, the trial court granted the motion; a copy of the drainage
plan was sent to Boudreaux only after the motion was granted. Boudreaux then filed a motion
requesting an injunction hearing, after which the injunction remained in place. On appeal, the court
concluded there was no evidentiary basis for the issuance of a permanent injunction ordering the
implementation of the proposed drainage plan, which was never introduced into evidence. 
Moreover, the trial court erred in granting a permanent injunction in addition to monetary damages,
as both addressed the same injury. 

 Boudreaux is distinguished from this case inasmuch as Boudreaux preserved, via post-trial
pleadings and presumed attendance at an injunction hearing he requested, his complaints regarding
the issuance of a permanent injunction. Here, the record is silent with regard to any complaint
regarding the issuance of a permanent injunction. Because Solomon's complaint of error in the
judgment was not preserved, that complaint cannot be considered on appeal. Tex. R. App. P. 33.1(a);
see also Homes, 244 S.W.3d at 582; Dal-Chrome Co., 183 S.W.3d at 144.

(7) Reconsidering Attorney's Fees Is Not Necessary

 In his final appellate point, Solomon urges a reconsideration of the issue of attorney's fees
for all parties, if Solomon prevails on any appellate point. Because Solomon's appellate points have
been overruled, this issue is moot. We, therefore, do not address the merits of this point.

 For the reasons stated herein, we overrule each of Solomon's appellate points and reform the
judgment of the trial court to require recovery of appellate attorney's fees to be expressly conditioned
on a successful appeal. 





 As modified, the judgment of the trial court is affirmed.


 

 Josh R. Morriss, III

 Chief Justice


Date Submitted: March 24, 2010

Date Decided: April 22, 2010

1. George D. Solomon alone is named as defendant by the Bullards; George and Jini Solomon
are named as defendants by Steitler. For ease of reading, further reference to George and Jini
Solomon or to George Solomon will simply be "Solomon" or "the Solomons."
2. This rather complex civil matter originated as a simple breach of contract claim by Steitler,
d/b/a North East Texas Land & Timber against the Solomons for failure to pay the balance due on
a contract for work performed in the construction of roads, dams, levees, ponds, and lakes on
approximately 400 acres of land owned by the Solomons. The Solomons filed a counterclaim for
damages incurred as a result of improper removal of trees and stumps. The counterclaim further
alleged that the oral contract between the parties called for Steitler to construct one lake, in
particular, of approximately fifty-five surface acres. Once constructed, the lake covered
approximately 100 surface acres. 

 The Bullards own approximately 104 acres adjacent to and surrounded on three sides by the
Solomons' property. When the 100-acre lake was constructed, water backed up and flooded the
Bullards' adjoining property. The flooding of the Bullards' property began in March 2006. The
portion of the Bullards' property flooded by the Solomons' lake varied between 14.65 acres and 18.2
acres, depending on rainfall. At the time of trial, 4.3 acres of the Bullards' property remained under
water. The flooded property was planted with pine and ornamental trees, through which the Bullards
had created a canopied lane on which to ride four-wheelers. The pine trees were planted as a
retirement plan, and were anticipated to be mature and ready for harvest when Mr. Bullard reached
retirement age. These trees were destroyed by the flooding.
3. The jury was asked to determine whether the negligence of Steitler and/or Solomon
proximately caused the damages to the Bullards' property, but did not find Steitler to have been
negligent. 
4. Section 41.004 of the Texas Civil Practice and Remedies Code provides, in relevant part:


 Factors Precluding Recovery

 

 (a) Except as provided by subsection (b), exemplary damages may be
awarded only if damages other than nominal damages are awarded.

 

 (b) Exemplary damages may not be awarded to a claimant who elects to
have his recovery multiplied under another statute.


Tex. Civ. Prac. & Rem. Code Ann. § 41.004 (Vernon 2008).
5. The question of whether such damages are recoverable under this section of the Code is a
question of statutory interpretation. Questions of statutory interpretation are questions of law
reviewed de novo. State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). 
6. Total compensatory damages were $82,225.00. Solomon concedes that a finding of
negligence with accompanying damages would have satisfied the independent tort requirement. 
7. The issue of negligence was not fully submitted, as there was no request of the jury to
determine what damages, if any, were proximately caused by said negligence. One could infer,
based on the inclusion of the term "the damages," that this question refers to the damages found by
the jury in response to the preceding question.
8. The jury was instructed that "Gross negligence" means an act or omission by George
Solomon,


 (a) which when viewed objectively from the standpoint of George Solomon at the
time of its occurrence involves an extreme degree of risk, considering the probability
and magnitude of the potential harm to Larry and Tina Bullard; and

 

 (b) of which George Solomon has actual, subjective awareness of the risk involved,
but nevertheless proceeds with conscious indifference to the rights, safety, or welfare
of Larry and Tina Bullard.


No objections were made to the charge of the court at trial or on appeal.
9. It would appear that, while the gross negligence inquiry was perhaps improperly predicated
on an affirmative response to the inquiry regarding violation of the Texas Water Code, rather than
an affirmative finding of negligence, this predicate serves to tie the gross negligence finding to
violation of the Texas Water Code. In other words, the affirmative response to the gross negligence
inquiry indicates the jury found Solomon to have been grossly negligent in violation of the Texas
Water Code.
10. We are mindful of the fact that Dutschmann has been relied on in support of the proposition
that a statutory violation cannot support a punitive damage award. In Dutschmann, the actual
damage award and attorney's fee award were based on both breach of contract and retaliatory
discharge (a statutory violation). The court upheld each of these awards based on the statutory
violation alone, because no contract existed as a matter of law. The retaliatory discharge claim was
based on Tex. Rev. Civ. Stat. Ann. art. 5221k, § 5.05, repealed by Act of May 12, 1993, 73rd Leg.,
R.S., ch. 269, § 5, 1993 Tex. Gen. Laws 987, 1273. Section 7.01 of former Article 5221k set forth
the type of relief available through civil actions. Under this statute, courts were permitted only to
order equitable relief. Article 5221k did not allow for recovery for other or additional damages,
including punitive damages. Therefore, the punitive damage award could not stand. Section 7.01
has been recodified in Tex. Labor Code Ann. § 21.2585 (Vernon 2006). See Act of May 14, 1993,
73rd Leg., R.S., ch. 276, § 7.01(e), 1993 Tex. Gen. Laws 1285, 1291 (effective September 1, 1993),
amended by Act of April 25, 1995, 74th Leg., R.S., ch. 76, § 9.07(b), 1995 Tex. Gen. Laws 458,
625-26, amended by Act of May 26, 1999, 76th Leg., R.S., ch. 872, § 13, 1999 Tex. Gen. Laws
3556, 3562. This section of the Code provides much the same type of equitable relief as provided
by former Article 5221k. However, Section 21.2585 permits the court, in addition to equitable relief,
to award compensatory and punitive damages. In Dutschmann, there was no statutory or common-
law basis for the recovery of punitive damages. The court's determination that there was no basis
on which the punitive damage award could be upheld cannot therefore be interpreted as broadly as
Solomon would propose. That is, Dutschmann is not properly interpreted to stand for the broad
proposition that a statutory violation can never support a punitive damage award. 
11. In the context of the anti-retaliation statute, which permits an employee to recover
"reasonable damages" incurred as a result of the violation of Section 451.001 of the Texas Labor
Code, the Texas Supreme Court has interpreted the term "reasonable damages" to include punitive
damages. Azar Nut Co. v. Caille, 734 S.W.2d 667 (Tex. 1987) (interpreting Tex. Labor Code
Ann. § 451.002 (Vernon 2006)). The court determined that "reasonable damages," for purposes of
this provision of the statute, are not limited to actual damages, but may include future damages, as
well as exemplary or punitive damages. Caille, 734 S.W.2d at 669; see also In re Poly-America,
L.P., 262 S.W.3d 337, 351 (Tex. 2008) ("reasonable damages" not limited to actual damages). 
12. On appeal, the court determined the finding of actual damages was not supported by the
evidence (finding in excess of the damage amounts proved) and remanded the case to determine
actual damages. 
13. In support of this proposition, Planet Plows relies on Tennessee Gas Transmission Co. v.
Moorhead, 405 S.W.2d 81 (Tex. App.--Beaumont 1966, writ ref'd n.r.e.). Moorhead involved a
Water Code violation in which the defendant permanently diverted the flow of the West San Jacinto
River by constructing an artificial channel and dam, without consent of the plaintiffs, causing
plaintiffs to lose river frontage and leaving them with no land abutting the river. The jury awarded
actual and exemplary damages. On appeal, defendants alleged that the pleadings were insufficient
to support a claim for exemplary damages. The court found to the contrary, and asked the jury the
following question:


 Do you find from a preponderance of the evidence that the Defendant through its
agents, servants, and employees acted willfully and with malice towards Plaintiffs by
the construction of the dam and channel?


The pleadings supported the submission of the foregoing question, which the jury answered in the
affirmative. Id. at 86. 
14. The jury was instructed that "unreasonable" means obstructing the flow of surface water
arbitrarily, negligently, wantonly, or without due regard for the adjoining property. Bily, 731 S.W.2d
at 613.
15. As our sister court explained in Tijerina:


 A careful reading of Dutschmann reveals the opinion actually stands for the
long-standing rule of law in Texas that a cause of action for breach of contract alone
will not support an award of punitive damages, but that there must also be a finding
of an independent tort. Indeed, numerous opinions from the Texas Supreme Court
and the courts of appeals have cited Dutschmann for this statement of the law. 
However, when alleging a violation of the Texas Anti-Retaliation law, the Texas
Supreme Court has held that where actual malice is shown, punitive damages may
be assessed against an employer for violating Section 451.001. Section 451.002
permits an employee to recover "reasonable damages" incurred as a result of the
violation of section 451.001, and that term has been interpreted to include punitive
damages. Thus, inasmuch as the statute prohibiting retaliatory discharge
contemplates punitive damages, WFM's contention that Tijerina was required to
plead and prove a separate tort in order to support her punitive damage award is
meritless.

 

979 S.W.2d at 780-81 (footnotes and citations omitted).
16. Solomon neither specially excepted to the pleadings nor filed a motion to remit damages
on the basis that the pleadings do not support the amount of the jury award.
17. We do not find this issue to have been waived. Neither a formal exception to a trial court
ruling or order nor a signed, separate order is required to preserve a complaint for appeal. Tex. R.
App. P. 33.1(c). More precisely, a complaint that the trial court erred in granting a directed verdict
may be reviewed on appeal, even if no exception is taken from the order granting the directed
verdict. See, e.g., Robertson v. Morin, No. 03-08-00527-CV, 2009 WL 2902720, at *7 (Tex.
App.--Austin Aug. 27, 2009, no pet.) (mem. op.).

18. Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages
suffered. Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 390 (Tex. 2000) (rule applies when
multiple defendants commit the same act as well as when defendants commit technically different
acts that result in single injury). This rule is further designed to prevent double recovery for actual
damages. Am. Baler Co. v. SRS Sys., Inc., 748 S.W.2d 243, 246 (Tex. App.--Houston [1st Dist.]
1988, writ denied). 
19. The Bullards did not file in the trial court a motion requesting injunctive relief; rather, the
request was included in the petition. 
20. Tex. R. App. P. 33.1(a).
21. The motion in opposition to the issuance of a permanent injunction did not raise the double
recovery issue (monetary damages for both temporary and permanent injuries were awarded) and
Boudreaux therefore failed to preserve for appeal complaints about the damages awarded. 
Boudreaux, 2005 WL 1111237, at *4. Boudreaux preserved his complaint regarding the issuance
of the permanent injunction.